UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Lloyd M. Hughes and Lloyd M. Hughes Enterprises, Inc. | ) ) ) | |
| Plaintiffs, | ) ) | No. _____ |
| v. | ) ) | |
| Inland Bank & Trust. | ) ) | Jury Trial Demanded |
| Defendants. | ) ) | |

## COMPLAINT

Lloyd M. Hughes ("Hughes") and Lloyd M. Hughes Enterprises, Inc. ("Hughes Enterprises") (collectively, "Plaintiffs"), by and through their attorneys, hereby complain against Defendant Inland Bank & Trust ("Inland" or "Bank") as follows.

## Introduction

1.     This case presents a classic example of unlawful equity stripping and racial discrimination.

2.     Plaintiffs have operated the laundromat known as "Laundryworld" for 48 years in a predominately African-American neighborhood on Chicago's South Side. In 2011, Inland Bank & Trust purchased out of receivership a loan that Hughes Enterprises had taken out in 2010 to improve Laundryworld and install new equipment.

3.     Smelling the chance to quickly make money on a loan that Inland likely purchased for pennies on the dollar, Inland thereafter engaged in a scheme to

cause Hughes Enterprises to default on the loan and allow Inland to foreclose on the Laundryworld property, as well as Mr. Hughes' personal residence and other residential property Mr. Hughes inherited from his father.

4.  In 2012, shortly after purchasing the loan and unbeknownst to Plaintiffs at the time, Inland entered into a consent decree with the FDIC and the Illinois Department of Financial and Professional Regulation that, for a period of eight months, prohibited Inland from modifying Plaintiffs' loan. During that time, however, Inland allowed Plaintiffs to make interest-only payments on the loan, informed Plaintiffs that Inland was considering a modification of the loan to extend the repayment period, and allowed Plaintiffs to make partial monthly payments. Inland, by and through its employees and representatives, assured Mr. Hughes that a modification would be worked out to allow Hughes and Hughes Enterprises to continue in good standing under the loan.

5.  As a result of Inland's predatory behavior, and in reliance on its repeated assurances that he need not make full payments on the loan while a modification was being worked out, Plaintiffs fell behind on the loan payments. In December 2013, Inland pulled the rug out from under Plaintiffs by announcing it would no longer consider any loan modifications. In April 2014, Inland took the final step in stripping Plaintiffs' equity, initiating foreclosure proceedings in Cook County Circuit Court that continue today.

6.  Inland's conduct violated several federal and Illinois statutes, as well as Plaintiffs' common law rights. Among other things, the equity stripping scheme

that Inland engaged in violated Plaintiffs' rights to be free from racial discrimination.

Parties, Jurisdiction, and Venue

7.    Lloyd Hughes is a citizen and resident of Illinois.

8.    Hughes Enterprises is an Illinois corporation with its principal place of business in Chicago, Illinois.

9.    Inland is an Illinois corporation with its principal place of business in Oak Park, Illinois. Inland is owned and controlled by the principals of Inland Group, which owns and operates a series of real estate trusts worth billions of dollars.

10.    The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because several of the claims arise under federal law. The Court has jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367.

11.    Venue is appropriate in this Court because all, or nearly all, of the events giving rise to this matter occurred in this judicial district and the parties are all residents of this judicial district.

**Facts**

12.    Mr. Hughes is a 67-year old, African-American business owner and life-long resident of Chicago.  Mr. Hughes is the sole owner and President of Hughes Enterprises, which Mr. Hughes formed as an Illinois corporation on July 10, 1972, after starting the company as a sole proprietorship in August 1967.

13.     Mr. Hughes, by and through Hughes Enterprises, is the sole owner and operator of a local neighborhood laundromat known as Laundryworld.  Mr. Hughes has owned and operated Laundryworld at the same South Side location since 1967. Laundryworld is one of the oldest locally-owned businesses in the surrounding neighborhood.

14.     Laundryworld is located at 6331 South Martin Luther King Drive, at the edge of the Woodlawn and Washington Park neighborhoods, an area considered to be one of the most violent neighborhoods in Chicago. There have been 83 homicides in Woodlawn since 2006, and 71 homicides in Washington Park during that time. Many of the businesses that used to serve these communities have shuttered in recent years, including the McDonald's next door to Laundryworld.

15.     Despite these challenges, Mr. Hughes has maintained Laundryworld as a beacon in the neighborhood. During the nearly 50 years that Mr. Hughes has operated Laundryworld, he has kept the business and building in excellent condition, adding new equipment and lighting to serve his customers and creating a private and secure parking area for his customers to make visits to Laundryworld as safe and secure as possible. Laundryworld has provided jobs in these neighborhoods for nearly five decades.

<u>The Loan</u>

16.     In 2010, Mr. Hughes decided to undertake a capital improvement project that included, *inter alia*, renovating the property and investing in new equipment.  To finance the project, Mr. Hughes applied for and obtained a

government-backed loan through the Small Business Administration's 7(a) loan program. The loan ("Loan") was issued by First Choice Bank of Geneva, Illinois, and secured by a mortgage ("Mortgage") given by the property's title holder in trust, Chicago Title Land Trust Company.

17. To further collateralize the loan, Mr. Hughes executed and delivered to First Choice Bank a personal guarantee secured by Mr. Hughes' personal residence and a residential property he had inherited from his father.

18. Plaintiffs had an excellent relationship with First Choice Bank, always paying their loan (and all other bills) in a timely manner. In turn, Plaintiffs received excellent service from First Choice.

<u>Inland Buys the Loan</u>

19. Like many banks in the wake of the national financial crisis, First Choice failed and entered receivership in 2011.

20. In 2011, Inland was expanding its balance sheet. At the time, one of Inland's tools for expanding was to shift responsibility for losses at the bank to other entities controlled by the Inland Group. This behavior would eventually draw the ire of state and federal regulators.

21. On or about August 19, 2011, Inland purchased the Loan, including the Mortgage, out of receivership. Upon information and belief, Inland purchased the Loan and Mortgage out of receivership at a substantial discount.

22.     At the time it purchased the Loan and Mortgage, Inland knew that the business and property were African-American owned, based on, *inter alia*, their proximity to Washington Park and Mr. Hughes' SBA loan application.

<u>Inland Destroys Plaintiffs' Equity</u>

23.     Immediately after purchasing the Loan and Mortgage, Inland began setting up Mr. Hughes and Hughes Enterprises to fail on the Loan and Mortgage, thereby allowing Inland to foreclose on the Laundryworld property, Mr. Hughes' principal residence, and the residence Mr. Hughes inherited from his father. This represented Inland's quickest path to making a windfall on the Loan.

24.     In retrospect, it is obvious what Inland's plan was. At the time, however, Plaintiffs had no idea what was around the corner.

25.     The process Inland followed is a well-known and well-worn path toward discriminatory equity stripping: (a) first, classify the loan as troubled and assign to a department in the bank that services troubled loans, (b) allow the borrower to make interest-only payments so that the principal on the loan does not diminish, (c) offer the borrower hope of a loan modification and allow partial payments in the meantime, and, finally, (d) once the borrower is so far behind on the loan he cannot catch up, foreclose.

*Inland Dumps the Loan into "Special Assets"*

26.     It is clear from that, from the very beginning, Inland had no intention of servicing an African-American owned business located in an African-American

neighborhood. Indeed, the very first thing Inland did with Plaintiffs' loan was reclassify it as a "troubled" loan, without any legitimate reason for doing .

27.     At the time Inland assumed the Loan and Mortgage, it immediately reclassified them and transferred them from the Bank's "Business Customer" department, to its "Special Assets" department. "Special Assets" is the classification Inland gives loans and other investments it intends to closely monitor and eventually liquidate.

28.     At the time Inland placed the Loan and Mortgage into Special Assets, Plaintiffs were current on their payments. In fact, they had never missed one penny of payments.

29.     As Hughes Enterprises was current on all payments at the time, Inland had no good faith reason to assign the Loan and Mortgage to Special Assets.

30.     Inland nevertheless reassigned the Loan and Mortgage to its Special Assets department for monitoring and eventual liquidation because it wanted to force the Loan and Mortgage into default and take all of the equity Plaintiffs had built up in the business and properties.

31.     By doing so, Inland treated Plaintiffs less favorably than similarly-situated non-African-American mortgagors who (like Plaintiffs) were current on their loans, but which the Bank (unlike with Plaintiffs) did not flag for monitoring and eventual liquidation.

32.     Inland did not wish to service a loan or mortgage for, or otherwise transact business with, an African-American owned business, located in a

predominately African-American neighborhood on the City's South Side. Thus, in order to rid itself of the Loan and Mortgage, Inland intentionally engaged in a discriminatory and predatory effort to induce default and initiate foreclosure proceedings, treating Mr. Hughes and Hughes Enterprises differently than non-African-American mortgagors.

*Inland Allows Interest-Only Period*

33.     Placing the Loan and Mortgage in the Special Assets department was not enough to trigger foreclosure, however. For that, Inland needed to entice Plaintiffs to fall behind.

34.     The next step in that process was allowing Hughes Enterprises to make interest-only payments, but only after causing Hughes Enterprises to incur substantial fees and fall behind on the Loan and Mortgage.

35.     In late 2011, Mr. Hughes requested a temporary modification of the Loan and Mortgage in the form of a twelve-month, interest-only payment period. Inland approved Mr. Hughes' request for a twelve-month interest only period on February 16, 2012. In the meantime, Mr. Hughes had been paying only the interest on the loan, and the Bank knew that Mr. Hughes was incurring monthly penalties and fees that were added to the principal on the loan.

36.     Inland then proceeded to delay its implementation for as long as it could. The Bank initially told Mr. Hughes that the paperwork necessary to complete the modification – which consisted of a one-page, three-paragraph "Letter Amendment" – would be completed and signed in a week. By mid-April 2012, Mr.

Hughes was still waiting for the letter to be delivered. Finally, in the last week of April – two and a half months after the Bank approved the modification – Inland sent Mr. Hughes the Letter Amendment for his signature. Over the course of its delay, the Bank continued to charge Plaintiffs the full amount of his payment, as well as late fees, thereby putting Plaintiffs further behind and making it more difficult for any deficiency to be repaid.

37. Inland's slow-playing of the issue allowed it to tack additional principal to the loan, thereby eating into the equity Plaintiffs had built up.

38. In addition, Inland charged Mr. Hughes an unlawful processing fee of $1,205.00, which it characterized as the "Letter Amendment fee." The SBA, however, expressly prohibits banks from charging such processing fees on SBA-backed loans. This fee was also tacked onto the principal that Inland sought from Plaintiffs.

*Inland Entices Plaintiffs with an Impossible Modification*

39. The twelve-month interest only period was set to end in February 2013.

40. Unbeknownst to Plaintiffs, during that time Inland was under investigation by the FDIC and IDFPR. That investigation led to a consent decree imposed on Inland in November 2012.

41. The consent decree clearly and explicitly prohibited Inland from extending or otherwise modifying loans such as Plaintiffs' Loan and Mortgage. (The consent decree is attached hereto as Exhibit A.)

42.     The consent decree contained no termination date or sunset provision. By its own terms, it was to bind Inland for the foreseeable future.

43.     Despite Inland having no ability to modify or extend the Loan and Mortgage, in early 2013, Inland began discussing with Mr. Hughes the possibility of modifying his mortgage to include a longer repayment period.

44.     Over the months that followed, Inland affirmatively and intentionally misled Mr. Hughes into believing that the Bank would agree to a further modification of the loan agreement, despite having no intention of ever doing so.  To that end, Inland acted to induce Mr. Hughes, through conflicting, misleading, and deceitful representations and assurances, into falling behind on his payments and defaulting on the Loan and Mortgage so that Inland could foreclose on the properties that secured the Mortgage.

45.     In or around March 2013, Inland Bank Vice President of Special Assets Mark Reid told Mr. Hughes that the Bank would consider a re-amortization of the Loan and Mortgage.

46.     Over the next several months, Reid and the Bank took steps that were consistent with a re-amortization of the Loan and Mortgage.  Reid assured Mr. Hughes on several occasions that Hughes Enterprises was not required to make the full monthly payments on the Loan and Mortgage while the parties worked out a loan modification, and that it should make whatever payment it could support until a modification was completed.

47.     In reliance on Mr. Reid's assurances, and while in continuous contact with Mr. Reid and others with the Bank while they discussed the loan modification, Mr. Hughes made partial payments on the Loan and Mortgage.  At no time did Inland tell Mr. Hughes that, by doing so, the Bank considered Hughes Enterprises to be in breach of the Loan or Mortgage.

48.     To the contrary, the Bank specifically told Mr. Hughes that it did *not* consider him to be in default, and that he should ignore notices to that effect the Bank had sent Mr. Hughes.

49.     On May 22, 2013, Inland sent Mr. Hughes a computer-generated form letter notifying Hughes Enterprises that it was in default.  The letter informed Mr. Hughes that, unless his account was brought to date within 10 days, the entire outstanding balance on the Loan would be due and owing.

50.     At Mr. Hughes' request, Mr. Hughes' attorney contacted Inland to inquire into why a default notice was issued when Hughes Enterprises had been making partial payments with the Bank's knowledge and acquiescence while the parties worked out the re-amortization.  Mr. Reid told Mr. Hughes and his attorney to ignore the letter, and that it did not consider him to be in default.

51.     In reliance on Reid's representations, Hughes Enterprises continued to make partial payments on the loan.  Inland accepted the partial payments despite its notice of default.

11

*Once Able to Make a Modification, Inland Moved to Default*

52.     At some point in July 2013, the FDIC and IDFPR lifted the consent order against Inland.

53.     Up until this time, Inland had steadfastly told Mr. Hughes it was considering making the modification (which it was legally barred from making).

54.     After July 2013, when Inland actually again had the ability to make the modification,[1] it started to change its tune.

55.     On September 26, 2013, Inland sent Mr. Hughes a second letter, again declaring Hughes Enterprises to be in default and notifying Mr. Hughes that the entire balance of the Loan was immediately due and owing.  The letter instructed Mr. Hughes, *inter alia*, to contact Inland's Lisa Kramer to discuss potential arrangements for payment.

56.     As instructed, Mr. Hughes contacted Ms. Kramer immediately upon receipt of the letter.  Ms. Kramer did not return Mr. Hughes' call.

57.     In fact, the die was cast at this point. Now that Hughes Enterprises was so deeply in the hole that it could not escape, Inland was in a strong position to pursue foreclosure.

_____

[1] As of July 2013, Inland was not only free to make the modification that would allow Plaintiffs to remain current on the loan, but Inland faced <u>no risk</u> in doing so. The SBA informed Mr. Hughes that it would guarantee any such modification and would recommend that the Bank make the modification. On information and belief, an SBA representative informed Mr. Reid of the SBA's position.

58.     Before doing so, however, Inland made sure that it would be foreclosing on something that would generate a profit. To that end, Inland insisted on re-appraising the property and equipment, under the guise that such appraisal would be necessary if Inland were to "move forward with an extension" of the Loan and Mortgage.  Upon information and belief, the Bank intentionally misrepresented to Mr. Hughes that the appraisal was to support his request for a modification when, in fact, it was performed in order to value the property for purposes of liquidation.

59.     Once the appraisal was complete, in December 2013, Inland told Plaintiffs that it would not modify the Loan or Mortgage and that Hughes Enterprises was in default.

60.     In April 2014, Inland initiated foreclosure proceedings on the Laundryworld property and equipment, as well as Mr. Hughes' personal residence and the home he inherited from his father.

61.     If Inland is successful in its foreclosure actions, it will have destroyed a nearly 50-year-old bastion of stability in a difficult neighborhood. This is all despite the fact that Laundryworld continues to recover from the Great Recession, and is now generating enough income for Plaintiffs to easily pay the Loan and Mortgage on a slightly extended repayment schedule.

62.     Inland knows that Plaintiffs could successfully repay the Loan and Mortgage if Inland gave the modest modification Plaintiffs requested. Inland further knows that the SBA would guarantee the loan, in any event. Yet, despite

the great probability that the Loan and Mortgage would be repaid in full and facing literally no risk in allowing the modification, Inland continues to insist that it destroy this long-standing African-American owned business.

63.     Plaintiffs hereby request a trial by jury on all claims so triable.

## COUNT I
## Racial Discrimination
## 42 U.S.C. § 1981

64.     Plaintiffs re-allege all previous paragraphs of this Complaint as if fully alleged herein.

65.     42 U.S.C. § 1981, as amended, guarantees all persons the same right "to make and enforce contracts" as non-African-Americans.  The term "make and enforce contracts" is defined to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

66.     Mr. Hughes is a 67-year old, African-American business owner.  By and through Lloyd M. Hughes Enterprises, Mr. Hughes is the sole owner and operator of Laundryworld, a laundromat located in and servicing an African-American neighborhood in the South Side of Chicago.

67.     By assigning the Loan and Mortgage to its Special Assets department for monitoring and eventual liquidation without any legitimate reason for doing so, inducing Mr. Hughes and Hughes Enterprises to default on the Loan and Mortgage, denying their request for a loan medication, and initiating and maintaining the foreclosure actions, Inland discriminated against Plaintiffs on the basis of race in

violation of 42 U.S.C. § 1981 by, *inter alia*, treating them differently than similarly-situated, non-African-American owned businesses and mortgagors whose loans the Bank did agree to modify.

## COUNT II
### Racial Discrimination
### 42 U.S.C. § 1982

68.     Plaintiffs re-allege all previous paragraphs of this Complaint as if fully alleged herein.

69.     42 U.S.C. § 1982 guarantees "[a]ll citizens of the United States . . . the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." Accordingly, Sec. 1982 prohibits both public and private racial discrimination in connection with real estate-related transactions.

70.     Mr. Hughes is a 67-year old, African-American business owner.  By and through Lloyd M. Hughes Enterprises, Mr. Hughes is the sole owner and operator of Laundryworld, a laundromat located in and servicing an African-American neighborhood in the South Side of Chicago.

71.     By assigning the Loan and Mortgage to its Special Assets department for monitoring and eventual liquidation without any legitimate reason for doing so, inducing Mr. Hughes and Hughes Enterprises to default on the Loan and Mortgage, denying their request for a loan medication, and initiating and maintaining the foreclosure actions, Inland discriminated against Plaintiffs on the basis of race in violation of 42 U.S.C. § 1982 by, *inter alia*, treating them differently than similarly-

situated, non-African-American owned businesses and mortgagors whose loans the bank did agree to modify.

## COUNT III
### Violation of the Fair Housing Act
### 42 U.S.C. § 3601, *et seq.*

72.     Plaintiffs re-allege and incorporate by reference all previous paragraphs of this Complaint as if fully stated herein.

73.     Mr. Hughes is a 67-year old, African-American business owner.  By and through Lloyd M. Hughes Enterprises, Mr. Hughes is the sole owner and operator of Laundryworld, a laundromat located in and servicing an African-American neighborhood on the South Side of Chicago.

74.     Sec. 3605 of the Fair Housing Act ("FHA") prohibits entities "whose business includes engaging in residential real estate-related transactions [from] discriminat[ing] against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race . . . ."  42 U.S.C. § 3605(a).

75.     Sec. 3605 of the FHA defines "residential real estate-related transactions" to include "[t]he making or purchasing of loans or providing other financial assistance . . .  secured by residential real estate."  42 U.S.C. § 3605(b)(1)(B).

76.     Plaintiffs' Mortgage was secured by residential real estate, including Mr. Hughes' personal residence and a single-family home inherited from his father.

Accordingly, the Mortgage at issue was is a "real estate-related transaction" within the meaning of the FHA.

77.     By assigning the Loan and Mortgage to its Special Assets department for monitoring and eventual liquidation without any legitimate reason for doing so, inducing Hughes Enterprises and Mr. Hughes to default on the Loan and Mortgage, denying their request for a loan modification, and initiating and maintaining the foreclosure actions, Inland discriminated against Plaintiffs on the basis of race in violation of the Fair Housing Act by, *inter alia*, treating them differently than similarly-situated, non-African-American owned businesses and mortgagors whose loans the Bank did agree to modify.

## COUNT IV
### Violation of the Federal Equal Credit Opportunity Act
### 15 U.S.C. § 1691, *et seq.*

78.     Plaintiffs re-allege all previous paragraphs of this Complaint as if fully alleged herein.

79.     Through all of the above-described conduct, Inland intentionally discriminated against Hughes Enterprises and Mr. Hughes on the basis of Mr. Hughes' race.

80.     This discriminatory conduct violated the federal Equal Credit Opportunity Act, 15 USC § 1691, *et seq.*

## COUNT V
## Tortious Interference with Business Expectancy

81.    Plaintiffs re-allege and incorporate by reference all previous paragraphs of this Complaint as if fully stated herein.

82.    Through all of the above-described conduct, Inland tortuously interfered with Plaintiffs' reasonable business expectancy. Inland was and is well aware that Plaintiffs operate Laundryworld, which has attracted a steady business for nearly 50 years.

83.    By the above-described conduct, Inland has harmed Plaintiffs' ability to maintain this business.

WHEREFORE, Lloyd M. Hughes and Lloyd M. Hughes Enterprises, Incorporated, respectfully request that the Court award them actual and punitive damages, attorney fees and costs, and any other relief that is just and proper.


Respectfully submitted,

LLOYD M. HUGHES and LLOYD M.
HUGHES ENTERPRISES, INC.


By:    /s/    John E. Bucheit
        One of Their Attorneys

John Bucheit
Zach Rustad
Roeser Bucheit & Graham LLC
Two N. Riverside Plaza, Ste. 1420
Chicago, Illinois 60606
(312) 621-0302

Daniel Twetten
Loevy & Loevy
312 N. May Street, Suite 100
Chicago, Illinois 60607
(312) 243-5900