# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LLOYD M. HUGHES and LLOYD M. HUGHES ENTERPRISES, INC., | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) Case No. 15 C 5006 ) |
| INLAND BANK AND TRUST, | ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Lloyd Hughes and his company, Lloyd M. Hughes Enterprises, Inc.—referred to collectively here as Hughes—have filed suit against Inland Bank and Trust, the owner of Hughes' loan. Hughes alleges that the bank discriminated against him based on his race when it denied his request to modify the terms of his loan and initiated foreclosure proceedings, in violation of 42 U.S.C. § 1981, 42 U.S.C. § 1982, the Fair Housing Act (FHA), and the Equal Credit Opportunity Act (ECOA). The Court previously dismissed Hughes' claim for tortious interference with business expectancy.

In March 2017, Inland filed this motion for summary judgment on all four claims of race discrimination. After the Court set a schedule for briefing the motion, it granted Hughes' counsel leave to withdraw. The Court extended the deadline for Hughes to respond to the motion. He did not file a response by the extended deadline and has not sought an extension of time. The Court therefore proceeds to rule on the motion. For the reasons discussed below, the Court grants summary judgment in favor of Inland.

**Background**

By failing to respond to Inland's Local Rule 56.1 submission accompanying its motion for summary judgment, Hughes is deemed to have admitted the facts set forth in that submission which are properly supported by admissible evidence. *See* N.D. Ill. R. 56.1(b)(3); *Cracco v. Bitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). Inland has therefore established the following as true.

Hughes is an African-American business owner and a lifelong resident of Chicago. He is the sole owner of Lloyd M. Hughes Enterprises, Inc., an Illinois corporation. Hughes owns and operates Laundryworld, a laundromat located at 6331 S. Martin Luther King Drive in Chicago. In June 2010, Hughes borrowed $625,000 from First Choice Bank under the Small Business Administration's loan program. The loan was secured by a mortgage in favor of First Choice against the laundromat. Hughes also signed a guarantee in favor of First Choice secured by a mortgage on two other pieces of real property.

In August 2011, Inland purchased out of receivership all of First Choice's loans, deposits, and facilities. As a result, Inland acquired ownership of Hughes' loan and the accompanying guarantee. Inland assigned Robert O'Brien as the loan officer for Hughes' loan. Sometime in 2011, Hughes submitted a request to adjust the payment schedule of the loan to allow twelve months of interest-only payments. In December 2011, O'Brien denied the request, stating, "Your business is unable to support the loan payments for the amount of debt outstanding." Def.'s Statement of Undisputed Material Facts (SUMF), Ex. J. He further indicated that the bank believed Hughes needed "to reduce this debt down to a more manageable amount" and that "[t]he way to do that is

2

to sell at least one of the homes that are securing this loan as collateral." *Id.*

O'Brien then left Inland. As a result, Inland had to assign Hughes' loan to another loan officer. O'Brien met with other Inland employees to determine to whom the loan should be assigned. Inland decided to transfer the loan to Mark Reid, an employee in its special assets division. The special assets division manages troubled loans, and officers in this division try to rehabilitate the loans by helping the borrowers improve business operations. Inland assigned Hughes' loan to this division based on his earlier statements to O'Brien that he was having difficulty making payments.

In early 2012, Hughes asked Reid to adjust the loan payment schedule to permit interest-only payments for twelve months. On February 16, 2012, Reid informed Hughes that Inland had approved the request and needed certain documentation from Hughes to finalize the modification. Hughes did not provide this paperwork until April 2012. Once finalized, the modification permitted interest-only payments for twelve months beginning February 24, 2012. Hughes made all of these payments.

During this interest-only period, Hughes also approached Reid about extending the term of the loan from twelve years to twenty-two or twenty-five years, because he anticipated not being able to return to full payments at the end of the twelve-month period. Once the interest-only period ended, Hughes stopped making full payments on the loan. Reid informed Hughes that, in order for Inland to consider the request for the extension, he would need to provide Inland with financial statements and try to bring the loan current by paying as much as he could towards the overdue payments. By September 2013, Reid had received all of Hughes' financial statements, but Hughes still had not caught up on his loan payments. After a review of these statements, Reid

3

determined that Hughes had not shown a sufficient increase in net income to justify a modification of the loan terms. Reid also determined that Hughes would not be able to make payments on the loan as currently written.

Hughes' loan was then assigned to Inland's SBA resources division, which was managed by Colleen Ryan. On September 26, 2013, Inland sent Hughes a notice of default. Hughes called Ryan on her cell phone number, which he obtained from an Inland employee. Hughes later testified that Ryan was unfriendly during this phone call and that this was because she could tell from his voice that he is African-American. Ryan testified that she was frightened because she had never met Hughes and yet he brought up personal details about her background and her children.

By April 2014, Inland had initiated foreclosure proceedings in the Circuit Court of Cook County.

## Discussion

Inland has moved for summary judgment on the four remaining counts, each of which involves a claim of racial discrimination. It argues that it is entitled to summary judgment because Hughes cannot show that the bank intended to discriminate against him due to his race.

When considering a motion for summary judgment, the Court views the facts and makes all inferences in the light most favorable to the nonmoving party. *East-Miller v. Lake Cty. Highway Dep't*, 421 F.3d 558, 561 (7th Cir. 2005). Summary judgment is appropriate when the evidence shows that there is no genuine dispute regarding any material fact and the moving party is entitled to judgment as a matter of law. *Id.* at 561. Because Hughes is deemed to have admitted all facts in Inland's Local Rule 56.1

4

submission, the Court need only determine if, upon these facts, Inland is entitled to judgment as a matter of law.

Under each of the statutes at issue in counts 1–4, Hughes must prove that Inland acted with discriminatory intent. *Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996) (section 1981); *Shaikh v. City of Chicago*, 341 F.3d 627, 630 (7th Cir. 2003) (section 1982), *Estate of Davis v. Wells Fargo Bank*, 633 F.3d 529, 539 (7th Cir. 2011) (FHA); *Latimore v. Citibank Fed. Sav. Bank*, 151 F.3d 712 (7th Cir. 1998) (ECOA). A plaintiff alleging racial discrimination in the credit context typically must demonstrate intent in "a conventional way" by using direct or circumstantial evidence. *Latimore*, 151 F.3d at 715. Circumstantial evidence consists of suspicious timing, ambiguous statements, suspect behavior toward those in the protected group, or reasons for acting that are not worthy of belief. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720–21 (7th Cir. 2005). The *McDonnell Douglas* burden-shifting framework used in the employment discrimination context is generally not available in the credit context unless a plaintiff can show that the lender considered two (or more) similar applicants for a loan and granted the loan to an applicant who lacked the protected characteristic. *Id.* at 714. Because Hughes' allegations focus on his treatment after receiving a loan, he must demonstrate discriminatory intent through the conventional method.

In his complaint, Hughes alleges that the following conduct demonstrates Inland's intent to discriminate: (1) assigning Hughes' loan to the special assets division without any legitimate reason; (2) inducing him to default on the loan; (3) denying his request for a loan modification; and (4) initiating foreclosure proceedings. *See* Compl. ¶ 67. But taking as true Inland's version of events (as required due to Hughes' failure to respond),

5

no reasonable jury could find any of these allegations to be true, and thus no reasonable jury could find that Inland intended to discriminate against Hughes due to his race. First, Reid testified that Inland assigned the loan to the special assets division because Hughes had told O'Brien he was having difficulty making payments. Reid also stated that he intended to help Hughes rehabilitate the loan if possible. And other facts cited by Inland support that it at least made efforts to avoid foreclosing after Hughes' admitted defaults. The evidence establishes that Inland had a legitimate reason for transferring the loan and did not do so as part of a scheme to foreclose on Hughes' property.

Further, Reid did not induce Hughes to make smaller payments and thereby default on his loan. Hughes told Reid sometime before February 2013 that he would not be able to make full payments when the interest-only period ended. And beginning May 2013, Hughes failed to make any full payments. After Hughes requested the modification, Reid told Hughes that he needed to be current on his payments in order to be eligible for the modification. Thus Reid was encouraging Hughes to catch up on his payments. He did not tell Hughes that incomplete payments would not trigger a default. Further, the terms of the loan agreement state that the borrower is in default if he "does not make a payment when due under this note." Def.'s SUMF, Ex. D at 3. Hughes failed to make full payments on his loan for five months. Inland did not induce Hughes' default.

Inland was also justified in its decision to deny the modification request and initiate foreclosure proceedings. The terms of the loan permitted Inland, in the event of default, to require immediate payment of the full amount owed and take possession of

6

any collateral. *Id.* Thus Hughes' failure to make loan payments—not his race—triggered Inland's conduct. There is no evidence that anyone at Inland ever made racially-disparaging comments to Hughes, nor does he have any other competent evidence that Inland's actions were due to his race. Therefore no reasonable jury could conclude that Inland intended to discriminate against Hughes. The Court grants summary judgment in favor of Inland on counts 1, 2, 3, and 4.

Even if Hughes had submitted a response in which he argued the presence of discriminatory animus based on the allegations on his complaint, this would not be sufficient to withstand summary judgment, as there is no evidence of disparate treatment. The evidence, at most, offers weak support for two of Hughes' allegations: that Inland assigned the loan to the special assets division without a legitimate reason and that Inland induced him to default on the loan. But the only evidence that supports these allegations is Hughes' own testimony. He testified that he disagreed with O'Brien's statements that he was struggling to make payments and therefore Inland should not have placed his loan in the special assets division. Def.'s SUMF, Ex. I (Hughes Dep. Part 1) at 44:7–45:8. Hughes also testified that, following the interest-only period that ended in February 2013, Reid told him that he could make less than full payments while Inland considered his modification and that doing so would not trigger default. *Id.* at 65:17–23, 86:19–87:2.

But this evidence is still insufficient to permit a reasonable jury to draw an inference of intent to discriminate. "To be convincing, [Hughes'] evidence must point directly to a discriminatory reason for [Inland's] action[s] and be directly related" to the contested decision. *Teruggi v. CIT Grp. / Capital Fin., Inc.*, 709 F.3d 654, 660 (7th Cir.

7

2013) (internal quotation marks omitted). There are no facts in the record which suggest that Inland's conduct had anything to do with Hughes' race. Hughes essentially relies on speculation in alleging that Inland's decisions were the product of racial discrimination; he bases this solely on the fact that he is African-American. *See Hutt v. AbbVie Prods. LLC*, 757 F.3d 687, 692 (7th Cir. 2014). He does not point to any conduct by any Inland employee that would permit a reasonable finding that Inland's decisions were racially motivated. And although Hughes appears to contend that Inland deviated in an unexplained way from its established practices in transferring his loan and denying his request for a modification, he would still have to "explain[ ] why these supposed infirmities . . . support an inference of discriminatory intent." *Smith v. Chicago Transit Auth.*, 806 F.3d 900, 907 (7th Cir. 2015). The fact that Inland's conduct may have been unwise does not support such an inference. *Teruggi*, 709 F.3d at 660–61; *see also Walker v. Bd. of Regents of Univ. of Wis. Sys.*, 410 F.3d 387, 396 (7th Cir. 2005) ("Even assuming, *arguendo*, that [defendant's] behavior was strange and inconsistent, nothing in the record supports an inference of sexism."). Without evidence that connects Inland's allegedly incorrect decisions to Hughes' race, he cannot support his claims of discriminatory intent. Thus, even if Hughes had submitted a response that tracked his complaint's allegations of discrimination, Inland would be entitled to summary judgment on counts 1, 2, 3, and 4.

## Conclusion

For the foregoing reasons, the Court grants Inland's motion for summary judgment [dkt. no. 76] and directs the Clerk to enter judgment in favor of defendant and

against plaintiffs.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: August 1, 2017